Niwayama v. Texas Tech Okay, Mr. St. Clair, when you're ready, sir. May it please the court and counsel. We're here today on a case involving the Equal Pay Act, which I'll refer to as the EPA, and Title VII pay discrimination claims, as well as Title VII tenure denial claim involving the Fair Pay Act. First of all, I think this court's well aware that the U.S. Supreme Court recently, in Tolan v. Cotton, set out what this court has to do de novo, as well as the lower courts, in determining summary judgments. In this case, unfortunately, the district court adopted all of the defendant's evidence, rejected the plaintiff's evidence, and ignored evidence submitted by the defendant that favored the plaintiff in this case. Let me just ask you a general question. You know, in these tenure cases, there may have never been a tenure decision made where there wasn't disagreement between the faculty, some of the faculty, and the higher-ups, as it went all the way up to the provost and goes up to the president. Does it mean where there's a candidate for tenure and there's a disagreement among the faculty, or you have the faculty, as the request goes up, that we're going to have a trial over that as a discrimination claim? I don't think so, Judge. I think, as in this case, it depends on what the facts are. And as the court knows, in an EPA case, that's strict liability, basically. And in this case, as I understand the brief of the defendant, Texas Tech, they really don't dispute on the EPA claim that we established a prima facie case. Well, under the EPA, then the burden of proof and persuasion shifts directly to Texas Tech to come in and prove one or more of the four affirmative statutory defenses. And that's where the battles fought in this case, Judge. I understand that tenure decisions are somewhat highly subjective in how they reach decisions on that, and there's lots of cases, but the cases also say that tenure decisions, although unique, somewhat unique, are subject to Title VII and they're clearly subject to the EPA. And in this case, I do want to point out that on page 32 of the brief of the defendant, I think they attempted to improperly shift the burden, and I want to make clear to this court that we do not agree with this. They state in their brief that Niawama cannot show that her pay differences were the result of her sex, therefore summary judgment was appropriate. That's absolutely not the burden on the plaintiff in an EPA case. And obviously the burden is a little higher in a Title VII paid discrimination case. But that's not the burden. Once we established our Prima Fasci case, then Texas Tech had to establish one or more of the four statutory defenses. It's equal pay for equal work. I'm going to refer the court to a chart that actually was a chart put in evidence by Texas Tech, and you should have it up there. It's one page, looks like this, and I've highlighted the provisions that I wanted to point out to the court because this is the easiest way, I think, for the court to determine comparators here. You'll see that Niawama is listed, and this is for the period of fiscal year 2012. This was her last year there because she was put on a terminal appointment. She was hired in 2004. At the time of 2012, she was not tenured. Her tenure had been denied, and it was moving on through the appellate process of the operating procedures of Texas Tech. She was paid at this time in September of 2011 approximately $62,000. She had been there eight years. Now, you look down at Dr. Mitreff at the bottom there. He's a male. He was hired in 2010. He was hired, not tenured. They're all associate professors, these three comparators. He was hired at $109,000. And then you look at Dr. Thompson, white male, associate professor, same as Dr. Niawama. He was hired in 2008. At this time, when this chart was prepared for the fiscal year 2012, he was paid almost $65,000 a year. There's a $40,000-plus difference between my client and Dr. Mitreff, who was just hired, and there's a $3,000 difference between a person that was hired in 2008, not tenured, same position, associate professor, making $3,000 more. So those are the easiest comparators for you all to look at. There were others that we discussed, and we brought evidence before to the court, the lower court, and it was rejected. Now, on the affirmative defenses, the burden of proof and persuasion is on Texas Tech, and it didn't meet its heavy burden according to the cases recognized in this circuit. It's a narrow construction is what the court is supposed to do in looking at these four affirmative defenses. And the defendant in this case was required to prove each affirmative defense so clearly that no rational jury could find otherwise at the summary judgment stage. Basically like a plaintiff trying to get summary judgment on an affirmative claim. That's correct, Your Honor. And, you know, a plaintiff trying to get summary judgment is a matter of law, trying to say we've proved our case. So we look at the merit-based pay system affirmative defense. Now, the interesting thing about this affirmative defense is it's stated by the Texas Tech officials that it's based on a complicated objective formula established by a merit pay committee. But the defendant didn't produce the formula. The defendant didn't say how the formula was applied or even describe the factors in the formula other than just some general statements. And clearly there is a grading system that happens, but Texas Tech, although it was their heavy burden to prove this defense, didn't bring forward the grading system so that we could see the documents and see how they applied this complicated allegedly objective formula. Now, they also say in their briefing and evidence that rank and tenure are not factors considered in merit pay raises. And then one of their other affidavits says merit pay is based on three major areas, which this court in opinions has recognized, teaching, research, and service. Well, if the court will refer to the letter I've got up there, it's highlighted. It's November 29, 2010. And this was the tenure hearing panel. They heard evidence, although Texas Tech was supposed to record this hearing, evidentiary hearing, so that the president could determine what went on and hear the evidence. But no such recording was either made or it was lost. It was not produced by Texas Tech. So the president, who's supposed to review the findings of this committee, didn't even have an opportunity to hear the evidence. Of course, he upheld the decision to deny tenure. But when you look at this, under merit-based pay, and the reason why this letter is important, and this is Texas Tech's document, is this is almost a year after or several months after tenure was denied. Dr. Niyawama appealed that decision according to Texas Tech's procedures, claiming that they were significantly noncompliant when they made their determination of tenure. And here's what some of the findings were. The committee found that the evaluation leading to Dr. Niyawama's denial of tenure was noncompliant with the department's established standards. And they gave two examples. They're not saying this is all. They're just saying here's two examples. Dr. Niyawama was held to a different standard in regard to grants and funding. And then they explained some examples of what happened. Secondly, on the second page of the letter, they found that Dr. Niyawama was held to a different standard regarding teaching evaluations. So here you have a committee that's heard evidence after the tenure denial by the provost on an appeal, and they're saying, whoa, guys, we've got a problem here. And then they conclude by saying, based on our findings, we do not believe that the faculty member was fairly evaluated based on consistent application of the established standards for tenure. So I think this case is a little bit unique in that you have an institution whose own policies and procedures have said, we've got a problem here. The tenure did not follow the established standards. We agree with the district court that the tenure claim is barred by limitations. In looking at the pay issue, how does the tenure issue impact that? Well, the reason why it impacts that, Your Honor, is because in the pay issue, they're talking about evaluating merit pay based on teaching, research, and service. Well, you've got this letter that talks about all those things, and they drop the ball. That's what this committee found is you didn't follow your standards in these areas. So I agree with Your Honor that even if the court finds that the Title VII tenure denial is barred by limitations, that still doesn't cause this to be irrelevant in this case. The other national origin is it seems like you're focusing mainly on the sex discrimination. Are you still pressing the discrimination because she was Japanese? Not really, Judge, from a standpoint of I think that's a weaker claim than the gender. I'm not saying we're abandoning it. I just think the evidence is difficult in that area. The other affirmative defense. So I think that there should be hopefully agreement that the merit-based pay system, there are major factual disputes on the teaching, research, and service by Dr. Niyawama. Then you move to other non-sex-based factors of defense. They use lack of tenure as a basis. They say that in their briefing and in their record. But then you look back at Mitreff in that chart that the court has, and they claim that he was a strategic hire because they wanted to obtain Tier I status. But that's nothing more than the old market forces argument that this court has rejected in Seiler-Coder and other cases over the years. You still can't discriminate because Mitreff was a good hire. He might help us get Tier I. You still have to look and make sure it's equal pay for equal work. And there's nothing in the record that indicates that. The only thing in the record is that someone made a conclusory statement that he was hired as a strategic hire. Nobody defines that. Texas Tech doesn't even define that for the court. What does that mean? That's not satisfying their burden. Then you've got Thompson, the other gentleman that I have on the chart there, Texas Tech has, there's no evidence showing the $3,000 disparity for him. None. They don't say he's a strategic hire or anything else. Now, we think that the Title VII pay discrimination, which is a little higher burden for us, all of the arguments I just made on that under the EPA, I think, also support that the court erred in granting summary judgment on the Title VII pay discrimination claim. There are major disputes about the facts. Finally, the Title VII limitations issue, I think this court is probably aware we briefed the Gentry case, the FPA relevance section for our case, and I'm reading this from the statute. An unlawful employment practice occurs when an individual is affected by application of a discriminatory compensation decision or other practice resulting in whole or in part from such a decision or other practice. There are cases in this circuit, the Gentry case, Southern District, Mississippi, 2009, that held that tenure decision denial in that particular case was saved by the FPA and the limitations did not apply. A Ledbetter Act, is that what we're talking about? Yes, the Lilly Ledbetter Fair Pay Act, Your Honor, that was passed in 2009. Then the Barnes case in 2013, which is not cited in the brief, but Eastern District, Louisiana, District Court there followed Gentry, and they both held that each paycheck received by, in this case, There are several cases, or a few in this circuit, most of them are failure to promote cases. We think the tenure denial is a little different animal, but still there are cases that hold otherwise, and there's a couple of circuits that have held otherwise, I believe the Third Circuit and maybe the District of Columbia. We feel like that that's an issue that needs to be clarified by this court so we can know what the law is. Okay, thank you very much. Thank you very much. Okay, Mr. Benson. Thank you. Apologies. May it please the Court. Counsel. Good morning, Your Honors. My name is Eric Vinson. I'm an Assistant Attorney General with the State of Texas. I'm from the General Litigation Division here, of course, representing Texas Tech University. Your Honors, I think the easiest way to resolve this appeal is to focus on the Equal Pay Act and look particularly at the evidentiary concerns and touch a bit, Judge Costa, on your point about the effect of limitations on the discrete decision to deny tenure. At the outset, it's going to be our position, as Your Honor suggests, that that is subject to limitations that is not actionable under Title VII, that they miss the deadline to file their EEOC complaint. And additionally, it is not the type of discrete act that would be actionable under the Equal Pay Act for the reasons outlined, as Counsel just talked about. There's a particular district court of Kansas has a very well-reasoned opinion as to why discrete employment acts that are above the surface, known to all, are not the type of act that are the continuing violation theory under Lilly Ledbetter. We've briefed that for you, and again, the opinion is very well-reasoned. If we focus on the Equal Pay Act claim, we did not concede the prima facie case in the first instance. We definitely spent more time on the affirmative defenses, but we did not concede the actual prima facie case. What we conceded was that amongst the range of salaries that various employees received in the department, there were men who made more money than Dr. Niwayama. At the same time, there were also women who made more than some men, and there were also men who made less than Dr. Niwayama. And I want to be very clear about the timing of her salary because in the last two years of her employment, she was in a bit of an unusual situation because she had been denied tenure. She was, as is usual, on a terminal appointment. And because her grievance took much longer than normal and normally would be anticipated, the President, in his discretion, gave her essentially a second terminal appointment. The evidence that we've provided to the Court in the record that was never controverted, never disputed, is that somebody who is on a terminal appointment is not entitled to a merit raise, does not participate in that process because they do not have a future at the university. And there has been no comparable individual that's been presented to this Court in the two years prior to her lawsuit who received terminal appointments and yet nonetheless received raises thereafter. The point about the other professor who received credit for funding that he had obtained while at technically a different institution but was for Texas Tech University does not go to the Equal Pay Act claim. And I want to talk about some specific differences in the chart that Counsel for the Plaintiff has provided, this one with the highlighting. Dr. Niwayama, as of September 1, 2011, is on a terminal contract. In fact, she's on her second terminal contract. So she is at the same salary she's now received at this point for her third year of the same salary. In an attempt to compare Dr. Niwayama to Jonathan Thompson and Mr. Metcalf or Dr. Metcalf, the argument is, well, they're all the same because they're all associate professors and look at the differences in pay. Well, the differences are that Dr. Thompson, who was hired in 2008, has not yet made his tenure run. He is still on tenure track, and that is a distinction that makes him not specifically comparable to Dr. Niwayama, who at that point is on a terminal contract. And as much fanfare as there has been made about the idea of a strategic hire of Dr. Metcalf, it is not the case that strategic hires are specifically excluded from consideration under the EPA, under market forces type arguments. The type of analysis that Counsel is talking about in the cases that he cited are when an employer tries to justify a That is, you know, barbers are preferred to be men, for example, and so the market demands men, male barbers. That is not an allowable defense under the EPA. However, a strategic hire to help a university obtain tier one status is gender neutral. It is not an attempt to— Did the university offer any context facts to how or why they thought she would improve the university? Well, Dr. Metcalf was actually a man. Yes. In fact, there was a press release that was included as an appendix exhibit to the summary judgment that is in the record. It might be Exhibit 19. I can confirm that for you, Your Honor, if that is critical. It essentially identified all of the strategic hires for that year and gave a short biography of who those individuals were and what they did. We did not engage in in-depth analysis from an evidentiary perspective about what all that means. But nonetheless, at the end of the day, even Dr. Metcalf is somebody with a future at Texas Tech University. He is not on a terminal contract, and he certainly did not replace Dr. Niwiyama. Sometimes there's some cases under the EPA if a person is the replacement employee who receives more than the person they replaced, that can be a prima facie evidence of discrimination. That's not the case here. The other point I would just identify here is not to forget that, and the trial court found this compelling, and it does go to the prima facie case, Dr. Hope Weeks, Louisa Hope Weeks, she is a woman in the department. She is making, at this point, $95,849. She is the second highest paid employee in, amongst this group, and it creates a problem for Dr. Niwiyama. The other, okay, so let's talk about the dates here. How far back can Dr. Niwiyama go for these comparisons, right? Because under the Equal Pay Act, she can go two years back on a straightforward claim, and she can go three years back if there's a willful violation. She filed her lawsuit on May 14, 2012. So for this time period, the September 1, 2011 to August 31, 2012 time period, she's obviously on the terminal contract, and that makes her different than any potential comparator because she's off of the tenure track. How far back can she go, you say? She can go two years back on just a straightforward Equal Pay Act claim, which would bring her back to May of 2010 when she actually was receiving a paycheck under, while she still was on tenure track. And so that's why we've had to put evidence in the record that explained the formulaic process for the determination of her salary for the 2009-2010 time frame. And although it is true that the actual formula itself was never produced, this is not an evidentiary issue that is currently before this Court. There was an objection raised in the summary judgment phase. The Court never made a ruling on it, and although there has been a generic complaint about that fact here, there is not a specific appeal of the trial court's implicit overruling of the objection on this point. And so, therefore, any complaints about that are waived. Yes, Your Honor. Well, if you have an affirmative defense that you're trying to show it's a merit-based system free of discrimination, how can you not reveal how it works? Well, and the characterization of what was presented is actually not accurate. What was described in some relatively gory detail in the affidavits, particularly that of Dr. Casadante, was all of the types of inputs that go into that specific formula relating to teaching, research, and service. And there was also a specific statement that neither gender nor race nor national origin nor any other prohibited class is a factor. None of those things are factors. And in response, Dr. Niyoyama was not able to controvert that asserted fact, right, that once we've established that, look, this is the way that the process works. We take these inputs. The committee takes X, Y, Z inputs. They then use or they then allocate the available funding that's been allotted to them for raises, and they distribute it across the department. The other point on this, of course, is that there was literally no discovery done at the trial phase about this particular issue. The plaintiffs did not take a single deposition. They did not send any interrogatories asking how does the formula work, what does it look like. They didn't do a 30 v. 6 deposition. Please have someone identify how this formula works. There were very broad discovery requests about your defenses. The information was given about the defenses. There was no complaint, no motion to compel, nothing until the objection was raised in the summary judgment context. The judge did not make a ruling on it, and it's not been complained about on appeal. And so, yes, it was our burden on the affirmative defense to show that, but it has not actually been controverted. That is our position. There is not a material dispute about whether the system was used and whether that system itself is a legitimate nondiscriminatory system that is one that would trigger that affirmative defense. I don't think you'd have to be pretty forthcoming with some details, though, to carry your burden. And we may just have a respectful disagreement on that, Your Honor, about what level of detail was required to be produced at that stage. The burden is of persuasion. It is not of ultimate . . . I understand. . . . ultimate . . . But isn't it on an affirmative defense? It's not a Title VII case where the plaintiff retains the burden. The district court here says plaintiff has failed to create a genuine issue of fact to call into question whether the pay differences were merely the result of a bona fide, merit-based system. Well . . . You have the burden of showing you have a . . . You have to show that a jury would have to find that this was the result of a merit-based, discrimination-free system. You've captured our burden correctly, and I think the court found that we had met our burden and then went to the last step of asking, because that's the process, right? Is there a system? Was it employed? And if it was employed, can the plaintiff create some evidence of material fact about whether that system either was or wasn't utilized or whether it includes prohibited facts? Here, obviously, on an EPA case, we're talking about sex. And so there's really . . . we're talking about both sides, I guess, of that process. First, did we, in the absence of any evidence that the plaintiff put forward, did Texas Tech University show that, in fact, they have a system? And they did, in fact, show that they have a system. They did not actually produce the system. They did not produce . . . whatever the formula is, I don't even know what it is. I don't even know that it's a document that can be produced. I don't literally know what form it's in. And because the plaintiffs have waived any complaint about that evidentiary point, unless the court is going to find that the actual system itself must be produced, then we have met our burden. And there actually is . . . one of the cases cited by the . . . I think actually cited by the plaintiff. It's the . . . let me get this right here. It's the EEOC case. I believe it's this EEOC case versus State of Delaware. It's widely cited, Third Circuit, 1989. This is the case where factors were identified by the defendant, but no one ever actually said on the defendant's side, on the employer's side, that the factors were actually utilized when the decision to make the salary determination or make the raise or whatever had been employed. And there, the court properly found that there was a proof failure on the employer's perspective. They did not find that because the factors themselves were not identified was enough to preclude them from having established their affirmative defense. What they said was you just didn't connect the dots. You didn't get from here to there. Here we have done that. We have said there's a system. We have said the system is gender neutral. And we have said that the one year in which her salary was subject to that determination that's actually within the limitations period was a result of that formula. And other than saying I don't know what the system is, I don't know what it means, I don't know what it looks like, she has not controverted those assertions of fact. And so therefore, on this record, it is our position that no reasonable jury could find anything other than the fact that we had made our burden under that affirmative defense. I do want to make the court aware of a relatively recent case that we did not cite, unfortunately. It is a Fifth Circuit case affirming, really without a lot of fanfare, the grant of a summary judgment of EPA on an EPA claim under the affirmative defense. And it's called Suter, S-U-T-E-R versus University of Texas at San Antonio. It's a Federal Appendix Case 495, Federal Appendix 506. And it just generally stands for the proposition that when the defendant meets their burden on the affirmative defense . . . Excuse me a minute about this letter by the review committee. Yes. Let me . . . Point two, they think that . . . they pick two comparators that they say are representative. And it's their judgment that they're legitimate comparators. And so wouldn't a jury be entitled to rely on that? Well, let's talk about what claim this letter relates to, first of all. This letter is solely driven at the tenure decision claim. Why wouldn't it also bleed over into the equal pay? Well, the . . . I mean, a couple of things. First of all, this is a committee that is looking essentially at the same facts we're looking at, without the same burdens of what the legal requirements are to either make the case, the prima facie case, or to make the affirmative defense. Let's talk about legitimacy of the comparators, though. Sure. Well, the primary comparator to me is actually the first point that they make about the faculty member who received a grant, not from Texas Tech University proper, but was given credit for it. And there's really . . . it's really pretty straightforward. Dr. Niwoyama, at the time she got her grant, the time she applied for it, the time she received it, and the first year's worth of funding under that grant, she was at Oklahoma State University. The other professor, the comparator that the plaintiffs are trying to compare to, at the time he sought the grant, he was employed not by Texas Tech University proper, but by Texas Tech Health Science Center, literally across the street, part of the same family of universities. At the time he applied for the grant, he had already received his offer letter from Texas Tech University, and it was always the intention that that grant would go to the benefit of Texas Tech University. And, in fact, it did go to the . . . all of it went to the benefit of Texas Tech University. And I understand that . . . and, essentially, my take on this letter that Your Honor is referring me to is that's not fair. That's not fair to Dr. Niwoyama, that even though she was at a different institution at the time that she received the grant, that's just not fair to treat her grant differently than we treat the grant of somebody who was a little nearer in time and maybe intended to come to this university. That's your reading of it. I mean, it seems the jury . . . It says she was held to different standards in terms of grants and teaching evaluations, which those were also part of the pay determinations, right? Well, now, the teaching evaluations are student-based. I mean, that's not something the university has any control over. Why are they saying she was held to a different standard than . . . Again, I can't explain why, reflectively, sitting essentially in Your Honor's position, they decided . . . I don't know what evidence they were looking at, and I don't know what criteria they were using, because that wasn't part of the record. There's simply this reflective statement that she was held to a different standard, without explaining what that standard was or what the facts were that led to that decision. And I can't agree . . . You could explain all that at a trial. Well, indeed, if all that has to happen, as Judge Davis intimated at the very beginning of this oral argument, if all that had to happen was we had some disagreement among the faculty about whether some decision should or shouldn't happen, we'd go to trial in every faculty case there ever was. A little bit more than that. They're saying that the review committee who heard evidence apparently said that this faculty member is being judged under a different standard. Maybe there was different evidence in front of that committee than is before this Court, because literally there is . . . other than this piece of paper, there is no evidence that she was, in fact, treated differently, other than the expressed difference that we've talked about, that a professor at the Texas Tech Health Science Center got credit for a grant while he was at the Health Science Center, on his way to Texas Tech University, and she didn't get credit for a grant while she was at a different institution, with no intention of coming to Texas Tech. Those are not comparable situations. That is not the same situation. This piece of paper just reflects the judgment of a committee that was convened to review the fairness of her being turned down. And not the legality of it. It's not just a piece of paper. It's not just a piece of paper. And it is fairness, Your Honor, but it's not the legality. It is not . . . they're not assessing the legality of the decision. They may be assessing the fairness. And before this court and before the trial court, the law matters, not the fairness. Okay. Thank you very much. Thank you. Thank you, Your Honor. We'll go back to you, Mr. Sinclair. A couple of things. Again, what I heard, and I could have been mistaken, I really think Texas Tech has just missed it on the burden on these EPA defenses. They can't just say a merit pay . . . we have a merit pay based system. That's what they've said. They haven't described what it is. And I'm going to read from the court their own evidence here in a second. But that's their burden. They're treating it like it's a Title VII claim. But we're talking about the EPA. And it is their burden to prove to some major level that a jury could find that their decisions for disparate pay under the EPA was nothing other . . . based on nothing other than a merit based pay system that we don't know anything about. Factual conclusions are not evidence. This court knows that. This court has held that. Factual conclusions are not evidence. And to come into this court or the district court and say, well, this is summary . . . this is valid summary judgment evidence when they have the burden. We all know that factual conclusions unsupported by putting meat on the bones is not evidence. And it's not something that we have to object to in order for that to be not considered as proper evidence in a summary judgment case. As far as the no concession of the EPA prima facie case, that surprises me in looking at the brief again. They say that, well, the last two years of the terminal appointment is the reason why there was disparate pay. That is totally contradictory to what Texas Tech says in its brief on page 33 to this court. And I'll just read it quickly. The department is allotted a certain sum from which to pay out merit raises, and the formula assigns a percentage of the pot to be paid to each faculty member, in parentheses, regardless of rank, tenure, or other delineation, parentheses close. It doesn't matter whether she's on a terminal appointment or not. She, equal pay for equal work. She should be paid $109,000 a year because their merit pay system doesn't base it on tenure. They say it in their brief. It's in the evidence. Dr. Hope Weeks is a female. Absolutely not a relevant consideration in an EPA case. Maybe in a Title VII case, maybe, but not in an EPA case. That's not a relevant factor. The formula on the merit pay system, I just read what their brief says, and now I'll read what Dr. Casadante says about that. He says, I continue to employ this from his affidavit or declaration in the record. I continue to employ a committee of chemistry faculty who devised a complicated formula, generally following the performance evaluation standards at Texas Tech, and which could be applied to award percentages of the allocated merit raise pool to individual faculty members based solely upon their merit. Now, that's all he says in his affidavit about it. That doesn't tell this court or the lower court what the system is. And then Dr. Korosniewski, who also was a faculty chair at one point in time, says the function of the chemistry and biochemistry department, however, the merit pay is largely formulaic and is based on measurable factors, not immeasurable opinions. What are they? She goes on to say, I allocated merit pay raises based on a formula created by a merit and productivity committee that took each faculty member's CV, teaching evaluations, and service contributions and set up an algorithm for computing merit raises. Where is it? This court needs to see, the lower court, the jury needs to see there's 23 males in the chemistry and biochemistry department at Texas Tech at the relevant time periods, three females. Who's on the committee? Are they male? Who are they? We don't know any of that. The jury needs to know it. The committee would send me the results of the calculation and I would allocate the raises accordingly. Where is the data? A majority of the grant that was received by Dr. Niyawama when she was at OSU came and was completely, the majority, substantial portion of it was used and spent at Texas Tech. Why didn't she get credit for that? Why didn't she? Plethora of evidence shows that fact issues regarding Texas Tech established standards were not followed. We've created fact issues and the jury needs to hear this case. Thank you for your time. Okay. Thank you, gentlemen. We have your case.